UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| DEMAJIO J ELLIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-04570-JPH-DLP |
| | ) | |
| DR. PAUL TALBOT, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Demajio Ellis brings this civil rights suit under 42 U.S.C. § 1983 alleging that defendant Dr. Paul Talbot was deliberately indifferent to his serious medical needs and retaliated against him for filing grievances. Specifically, Mr. Ellis believes that he suffers from a serious, undiagnosed heart issue in addition to his mild asthma and that Dr. Talbot's failure to treat his illnesses could result in serious health consequences, including his death. He alleges that Dr. Talbot began to deny tests and referrals after Mr. Ellis submitted a grievance about his medical care.

Dr. Talbot seeks summary judgment.[1] The undisputed evidence shows that Dr. Talbot exercised reasonable medical judgment in response to Mr. Ellis' reported symptoms, and Mr. Ellis has offered no evidence showing a retaliatory motive for Dr. Talbot's medical decisions. Accordingly, the motion for summary judgment must be **granted**.

[1] The motion addressed claims against Dr. Talbot and nurse Jonathan Grimes, but Mr. Ellis dismissed his claims against Mr. Grimes and non-medical defendant Dushan Zatecky. *See* dkts. 77, 81. Dr. Talbot is the only remaining defendant.

## I. Summary Judgment Standard

A motion for summary judgment asks the Court to find that the movant is entitled to judgment as a matter of law because there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a). A party must support any asserted disputed or undisputed fact by citing to specific portions of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party may also support a fact by showing that the materials cited by an adverse party do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the only disputed facts that matter are material ones—those that might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941–42 (7th Cir. 2016). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page*, 906 F.3d 606, 609−10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Ill. Cent. R.R.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).

The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant. *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (quotation marks omitted); *see also* Fed. R. Civ. P. 56(c)(3).

**II. Facts**

Mr. Ellis has been incarcerated at Pendleton Correctional Facility (PCF) since August 2018. Dkt. 72-6 at 13. Before his incarceration, Mr. Ellis was never treated for chest pains or breathing issues. *Id.* at 16. While he was in the St. Joseph County Jail, he was sent to a clinic after reporting chest pain and breathing issues in late 2017 or early 2018, but he received no treatment. *Id.* at 16–17. After he was convicted and sentenced to the Indiana Department of Correction, Mr. Ellis was sent to the Reception Diagnostic Center for about a month before his transfer to PCF. *Id.* at 19. There, he was not treated for any physical ailments but was prescribed medication for mental health issues. *Id.* at 20.

Mr. Ellis' mental health diagnoses include bipolar disorder, anxiety, depression, antisocial personality disorder, and attention deficit hyperactive disorder. *Id.* at 18–19. He was prescribed Prozac and Lamictal between February and November 2018 to address his anxiety and mood fluctuations. *Id.* at 54–55.

Dr. Talbot is a doctor who was employed at PCF From April 1, 2017, to November 2019. Dkt. 72-2 at ¶¶ 1–2. Dr. Talbot saw Mr. Ellis fourteen times between February and November 2019 and also reviewed his records and ordered medications between visits. Dr. Talbot took Mr. Ellis' vitals—blood pressure, temperature, and oxygen saturation rate—at every appointment. *Id.* at ¶ 51.

The Court summarizes Dr. Talbot's treatment of Mr. Ellis as follows (dates of in-person appointments with Dr. Talbot in bold):

- **February 5:** Mr. Ellis complained of shortness of breath and chest pain. Mr. Ellis had been told that he had a bowed sternum, but Dr. Talbot's examination did not indicate such. Dr. Talbot suspected that Mr. Ellis was suffering from costochondritis, which is inflammation of the cartilage connecting the ribs to the sternum. He prescribed Tylenol to address Mr. Ellis' complaints of chest pain. *Id.* at ¶¶ 6, 9.
- **February 12:** Dr. Talbot saw Mr. Ellis for complaints of finger pain. The physical exam was unremarkable—no joint stiffness, tenderness, or deformity—but based on Mr. Ellis' reported pain, Dr. Talbot again provided Tylenol. *Id.* at ¶ 10.
- **February 26:** Dr. Talbot saw Mr. Ellis for complaints of finger pain, headaches, and shortness of breath. Mr. Ellis appeared very anxious during the visit. Mr. Ellis requested a CT Scan, alleging he had experienced headaches for six years. He denied having a headache that day, and Dr. Talbot's physical exam was unremarkable. Dr. Talbot explained that a CT scan was not necessary and actually posed a risk since CT scans involve radiation. For his breathing trouble, Dr. Talbot ordered an on-site spirometry test to assess Mr. Ellis for asthma. Dr. Talbot again examined Mr. Ellis' hand, which was normal, and provided him more Tylenol. Mr. Ellis reported that his heartbeat was sometimes too fast and sometimes too slow. Dr. Talbot advised him that his examination was normal but if Mr. Ellis' heartrate was abnormal in the future, an electrocardiogram (EKG) could be administered. Mr. Ellis' body mass index of 34.94 placed him in the obese

category. Dr. Talbot counseled Mr. Ellis that losing weight could lower his blood pressure, reduce strain on joints, and alleviate breathing issues. Because of Mr. Ellis' anxious demeanor, Dr. Talbot referred him to be evaluated by mental health staff. *Id.* at ¶ 12.

- Mr. Ellis took a spirometry test (aka Pulmonary Function Test) on March 20. Dr. Talbot reviewed the results and determined that Mr. Ellis had mild persistent asthma. Mild persistent asthma is characterized by symptoms which occur more than twice a week but not daily. Asthma attacks may interfere with daily activities. Dr. Talbot prescribed a rescue inhaler. *Id.* at ¶¶ 15–16.
- **April 2:** Dr. Talbot explained the results of the spirometry test to Mr. Ellis and prescribed Singulair, an anti-inflammatory used to treat allergies and asthma. *Id.* at ¶ 17.
- **April 16:** Mr. Ellis reported that he had heart and lung problems. He displayed no symptoms of distress, and his physical exam was normal. Dr. Talbot again explained Mr. Ellis' diagnosis of mild persistent asthma and reiterated that he had a rescue inhaler and Singulair to treat his asthma. *Id.* at ¶ 19.
- **April 30:** Dr. Talbot saw Mr. Ellis for a follow-up for asthma and conducted a breathing test where he measured Mr. Ellis' peak respiratory flows. Mr. Ellis remained on the rescue inhaler and Singulair after this visit. Mr. Ellis also requested an EKG but exhibited no signs indicating one was needed. *Id.* at ¶ 21.

- **July 15:**[2] Mr. Ellis reported that he passed out in his cell on July 8 because other inmates were smoking in their cells. Dkt. 72-3 at 27. He requested a chest x-ray and test for blood clots. *Id.* His exam was normal, and he exhibited no breathing difficulties. He appeared anxious. Dr. Talbot again explained Mr. Ellis' asthma diagnosis and determined there was no need for a chest x-ray given the management of his mild asthma through his prescribed medications. Dkt. 72-2 at ¶ 26.
- **August 13:** Dr. Talbot saw Mr. Ellis for complaints of a sinus issue. Dr. Talbot observed redness in Mr. Ellis' nasal passages and prescribed him an antibiotic. *Id.* at ¶ 28.
- **August 26:** Dr. Talbot saw Mr. Ellis for complaints of back pain and gastrointestinal issues. Dr. Talbot did not observe pain, but he prescribed extra strength Tylenol and instructed Mr. Ellis on a home exercise plan for his back. Mr. Ellis' gastrointestinal symptoms were consistent with Gastroesophageal Reflux Disease (GERD), so Dr. Talbot also prescribed Pepcid, an antihistamine and antacid. *Id.* at ¶ 30.
- **September 24:** Dr. Talbot saw Mr. Ellis to address Mr. Ellis' reported cough and request to be housed in a medical dorm. They discussed his asthma diagnosis, and Dr. Talbot measured his peak respiratory flows. Dr. Talbot diagnosed Mr. Ellis with bronchitis and prescribed Azithromycin, an antibiotic, and Albuterol Sulfate nebulizer treatments to ease respiration. *Id.* at ¶¶ 32–34.

[2] Between the April 30 and July 15 visits with Dr. Talbot, Mr. Ellis was seen by nurses on May 8, June 5, and June 11. *Id.* at ¶¶ 23–25. At one visit, Mr. Ellis reported he had "a fatal illness." Dkt. 72-3 at 26. Because he showed no symptoms of a serious illness, he was again referred to be assessed by mental health. *Id.*

- **October 29:** Dr. Ellis saw Mr. Ellis for a chronic care visit to address his asthma. Dr. Talbot measured his peak respiratory flows, which showed improvement. The physical exam was unremarkable except for a persistent cough, for which Dr. Talbot prescribed Prednisone, a corticosteroid. He also renewed the prescriptions for the rescue inhaler and Singulair. *Id.* at ¶ 36.
- **November 5:** Mr. Ellis complained of headaches and shortness of breath and requested a special medical diet consisting of only fruits and vegetables. Dr. Talbot told Mr. Ellis he had no medical need for a special diet given his stable weight. Dr. Talbot told Mr. Ellis that his headaches likely were caused by inhaling smoke from other inmates setting fires in his housing unit. Dr. Talbot advised Mr. Ellis to take his Singulair for this and prescribed Tylenol. Although Mr. Ellis reported shortness of breath, he performed well on his peak flow respiration test. Dr. Talbot ordered a chest x-ray to monitor his condition. Dr. Talbot also prescribed Mr. Ellis a steroid nasal spray to treat nasal polyps. *Id.* at ¶¶ 38–39. Based on Mr. Ellis' elevated blood pressure, Dr. Talbot also ordered weekly blood pressure monitoring. *Id.* at ¶ 40. Dr. Talbot attributed the high blood pressure reading to the Prednisone. *Id.* at ¶ 51.
- **November 19:** Mr. Ellis told Dr. Talbot that he had received his Singulair but not the nasal spray, so Dr. Talbot resubmitted a request for the nasal spray to the Regional Medical Director. They discussed his chest x-ray results, which were normal. Dr. Talbot measured Mr. Ellis' peak expiratory flows. *Id.* at ¶ 41.
- **November 26:** At their last visit, Mr. Ellis complained of shortness of breath and indigestion. The physical exam was unremarkable. Dr. Talbot re-prescribed

Pepcid for Mr. Ellis' GERD symptoms and counseled him on his asthma medication. *Id.* at ¶ 42.

Dr. Talbot never witnessed Mr. Ellis exhibit difficulty breathing or distress. *Id.* at ¶ 45. Mr. Ellis never requested a refill of his rescue inhaler before he was scheduled for a refill, indicating that he was not using it more than expected for someone with mild persistent asthma. *Id.* According to Dr. Talbot, taking a patient's vital signs is an important metric for assessing complaints of pain and distress, especially for someone like Mr. Ellis who reports trouble breathing but doesn't display any symptoms. *Id.* at ¶ 46. Mr. Ellis' temperature, pulse, and oxygen saturation levels were consistently in the normal range. *Id.* at ¶ 51. Mr. Ellis' blood pressure was occasionally elevated. *Id.* When that occurred, Dr. Talbot counseled Mr. Ellis to lose weight and referred him to mental health for assessment and treatment for bouts of notable anxiety. *Id.* Dr. Talbot also ordered weekly monitoring of Mr. Ellis' blood pressure when it was particularly elevated while he was taking Prednisone. *Id.*

Mr. Ellis had several EKG tests in 2019 and 2020. *Id.* at ¶ 52. Three were taken when Dr. Talbot was Mr. Ellis' principal medical provider, all of which indicated that Mr. Ellis had a normal sinus rhythm.[3] Dkt. 72-3 at 73–79 (EKG reports from May 9, 2019, November 11, 2019, and November 25, 2019). Based on the numerous unremarkable physical examinations of Mr. Ellis—including assessments of his breathing and cardiac functioning—combined with the normal EKG results, Dr. Talbot did not think Mr. Ellis has a diagnosable heart condition. *Id.* at ¶ 54. Rather, "Mr. Ellis repeatedly presented as anxious and fixated on his belief that he had significant medical complications despite medical assessments to the contrary." *Id.* Based on Dr. Talbot's assessments of Mr. Ellis and a lack of objective signs to the contrary, there was no

[3] A "normal" EKG is one that depicts a sinus rhythm where the heart beats between 60 and 100 beats per minute.

medical justification to place Mr. Ellis on a special diet or house him in a medical dorm. *Id.* at ¶¶ 55–56.

Mr. Ellis disputes that his EKG results were consistently normal, pointing out a March 27, 2020, EKG which stated he showed "sinus tachycardia with 2nd degree AU block (Mobitz I) with 2:1 AU conduction. Abnormal EKG."[4] Dkt. 72-3 at 72; dkt. 80-1 at 5. Despite what it states on the EKG, nurse Kathleen Smith wrote in Mr. Ellis' medical records, "EKG was done and was normal." Dkt. 39-1 at 19.

Mr. Ellis alleges that Dr. Talbot was not "trying to get to the bottom of [his] issues" and that the medication worsened his symptoms. Dkt. 72-6 at 53. Specifically, he alleges he passed out in his cell more than 20 times since being prescribed an inhaler and other medication. *Id.* at 59; dkt. 80-1 at 2, ¶ 3. No one ever witnessed Mr. Ellis pass out, and he never passed out while walking to his medical exams or anywhere else at PCF. Dkt. 72-6 at 57–58. Mr. Ellis acknowledges that he has no medical training. Dkt. 72-6 at 10, 36 ("I'm not a doctor, so I don't know exactly what's going on with me until I get checked out.").

Since Dr. Talbot left PCF, Mr. Ellis has been seen by other medical providers. Dkt. 39-1. They have continued to treat Mr. Ellis' asthma and monitor his respiratory function. *Id.* at 1−4. Mr. Ellis has continued to complain of headaches, chest pain, shortness of breath, and a rapid heartrate, but all tests have returned normal results. *Id.*

## III. Analysis

Mr. Ellis argues that Dr. Talbot deprived him of the level of medical care required by the Eighth Amendment. Specifically, he alleges that his asthma and an undiagnosed heart condition are serious medical conditions that have caused him to faint dozens of times and could lead to an early death, and that Dr. Talbot's treatment decisions exacerbated his condition. He also argued

[4] The admissibility of this evidence will be discussed in the next section.

in his amended complaint that Dr. Talbot refused to order proper tests or render appropriate care because he was upset that Mr. Ellis had filed a grievance about him.

**A. Eighth Amendment**

"Prison officials violate the [Eighth Amendment's] prohibition on cruel and unusual punishment if they act with deliberate indifference to a prisoner's serious medical condition." *Perry v. Sims*, 990 F.3d 505, 511 (7th Cir. 2021) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). The deliberate indifference "standard encompasses both an objective and subjective element: (1) the harm that befell the prisoner must be objectively, sufficiently serious and a substantial risk to his or her health or safety, and (2) the individual defendants were deliberately indifferent to the substantial risk to the prisoner's health and safety." *Eagan v. Dempsey*, 987 F.3d 667, 693 (7th Cir. 2021) (internal quotation omitted).

As to the first element, a "medical condition is serious if it has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would perceive the need for a doctor's attention." *Perry*, 990 F.3d at 511 (cleaned up).

"The second element of deliberate indifference is proven by demonstrating that a prison official knows of a substantial risk of harm to an inmate and either acts or fails to act in disregard of that risk." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (cleaned up). A defendant must make a decision that represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* (quoting *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008)). In other words, "deliberate indifference requires 'more than negligence and approaches intentional wrongdoing.'" *Goodloe v. Sood*, 947 F.3d 1026, 1030 (7th Cir. 2020) (quoting *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011)).

The Seventh Circuit has explained that "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.*

**i. Admissibility of Mr. Ellis' Evidence**

In response to the motion for summary judgment, Mr. Ellis designated his affidavit, a March 27, 2020, EKG result, and a WebMD article about Costochondritis as evidence. Dkt. 80-1. The defendants argue that the EKG results and the WebMD article should be excluded because they were not disclosed to the defendants in violation of Federal Rule of Civil Procedure 26(a)(1)(A)(ii) and the Court's pretrial schedule. Dkt. 83 at 3. The Court agrees with respect to the WebMD article but disagrees as to the EKG result. The EKG printout was included in the defendants' exhibits, dkt. 72-3 at 72, and thus cannot constitute an "ambush[]" as the defendants suggest, dkt. 83 at 3. However, the Court will not consider Mr. Ellis' statement in his affidavit that "March 27, 2020 I had a abnormal EKG result and Dr. Mr. Kiser…told me that there is a blockage of the coronary arteries resulting in insufficient blood and oxygen reaching my heart and that one day it could lead to me having to have surgery and have a tube put into my heart." Dkt. 80-1 at 1, ¶ 1. This assertion is inadmissible hearsay. Fed. R. Evid. 801(c).

**ii. Serious Medical Condition**

Dr. Talbot argues that Mr. Ellis does not suffer from a serious medical condition and therefore does not satisfy the objective element of the deliberate indifference prong.

"When assessing an Eighth Amendment claim, we look for physical injury 'that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic pain.'" *Gray v. Hardy*, 826 F.3d 1000, 1007 (7th Cir. 2016) (quoting *Hayes v. Snyder*, 546 F.3d 516, 325 (7th Cir. 2008)). And there is no question that "[a]sthma, if serious enough, can constitute injury for Eighth Amendment purposes." *Id.*

The defendants highlight the similarities between this case and *Kadamovas v. Caraway*, where this Court held that the plaintiff's mild persistent asthma did not satisfy the objective component of the deliberate indifference standard. *Kadamovas v. Caraway*, No. 2:17-CV-00050-WTL-MJD, 2018 WL 6415588, at *12 (S.D. Ind. Dec. 6, 2018), *aff'd*, 775 F. App'x 242 (7th Cir. 2019), *cert. denied*, 140 S. Ct. 890 (2020). Kadamovas was diagnosed with mild persistent asthma based on his complaints that he had trouble breathing whenever smoke or chemical gas came into his cell. *Id.* at *2. He was repeatedly evaluated by medical staff, who observed no signs of distress and noted normal respiration. *Id.* at *3−4. But that is a significant distinguishing fact: "[T]here [were] no objective medical signs through pulmonary function testing, CT scans, or chest x-rays that show that Mr. Kadamovas suffers from asthma." *Id.* at *11.

Unlike *Kadamovas*, Mr. Ellis was diagnosed with mild asthma based on the results of a spirometry test. And Dr. Talbot has treated Mr. Ellis' asthma with inhalers and nebulizer treatments, indicating that Mr. Ellis' asthma is "worthy of comment or treatment." *Gray*, 826 F.3d at 1007. Thus, at minimum there is a material issue of fact as to whether Mr. Ellis' asthma constitutes a serious medical need.[5] Therefore, the Court must consider whether Dr. Talbot was deliberately indifferent to Mr. Ellis' asthma.

---

[5] Notably, the Seventh Circuit affirmed the district court's granting of summary judgment on the second element of the deliberate indifference test. *Kadamovas*, 775 F. App'x at 244 ("Even if we accept

On the other hand, there is no evidence supporting Mr. Ellis's claim that he was suffering from a serious heart condition while Dr. Talbot treated him. Mr. Ellis reported symptoms such as a rapid heartbeat and chest pain. But Dr. Talbot took Mr. Ellis' vitals at each visit, and his pulse was consistently normal. In response to Mr. Ellis' report of chest pain, he was provided three EKGs, all of which returned normal results. Dr. Talbot attributed Mr. Ellis' perceived conditions to his anxiety, and when Mr. Ellis appeared particularly anxious, Dr. Talbot referred him to the mental health provider. Dkt. 72-2 at ¶¶ 12, 54, 56. Testing has not revealed any heart condition, and Mr. Ellis' subjective belief alone is insufficient to demonstrate he has one. *See Jackson v. Anderson*, 770 F. App'x 291, 293 (7th Cir. 2019) (observing that nurses were not required to adopt plaintiff's self-diagnosis of a broken bone where their examinations ruled out any signs of one).

**iii. Deliberate Indifference**

When evaluating a claim of deliberate indifference under the Eighth Amendment, the Court must defer to the treatment decisions of medical professionals "unless no minimally competent professional would have so responded under those circumstances." *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019) (internal quotation marks and citations omitted). This is because "there is no single proper way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field." *Id.* Deliberate indifference "requires something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Donald v. Wexford Health Sources*, 982 F.3d 451, 458 (7th Cir. 2021) (internal quotations omitted). Also, the Court examines the totality of medical care provided to a prisoner when evaluating whether the medical provider was deliberately indifferent. *Wilson v. Adams*, 901 F.3d 816, 821 (7th Cir. 2018).

---

Kadamovas's contention that his medical condition is serious, he has not raised a fact question over the subjective component of deliberate indifference.").

Over nine months, Dr. Talbot treated Mr. Ellis fourteen times. At each visit, he responded to Mr. Ellis' concerns by (1) providing medication to treat Mr. Ellis' reported pain, asthma, headaches, GERD, bronchitis, cough, and nasal polyps, (2) ordering diagnostic tests including the spirometry and a chest x-ray to diagnose and monitor his asthma, (3) counseling him to lose weight to improve his breathing and decrease joint pain, and (4) referring him to a mental health provider based on his observable anxiety.

The EKGs Mr. Ellis received during Dr. Talbot's tenure at PCF all showed normal heart functioning. Mr. Ellis had one EKG on March 27, 2020—four months after Dr. Talbot left PCF—that produced abnormal results. Dkt. 72-3 at 72. But Mr. Ellis has produced no relevant evidence explaining what it means for an EKG to show "sinus tachycardia with 2nd degree AU block with 2:1 AU conduction." *Id.* The nurse who examined Mr. Ellis reported that this EKG was normal, dkt. 39-1, and there is no indication that Mr. Ellis received any diagnosis or treatment different than what Dr. Talbot provided as a result of the EKG. Moreover, this EKG is not evidence that Dr. Talbot knowingly disregarded a serious risk four months earlier, when his most recent EKGs showed normal functioning.

Mr. Ellis alleges that he passed out several times in his cell. Dkt. 72-6 at 56. No one ever witnessed him passing out, and he never passed out anywhere else in the prison. *Id.* at 56−58. But, accepting Mr. Ellis' testimony that he fainted as true, he also testified that he received chest and cardiac exams in response to his reports of fainting. *Id.* at 58. Thus, the medical staff was responsive—not indifferent—to this condition.

Although Mr. Ellis wanted to be placed in a medical dorm and receive a special diet, Dr. Talbot determined there was no medical reason to justify either. Mr. Ellis has no constitutional right to demand specific care. *Arnett*, 658 F.3d at 754. His disagreement with

Dr. Talbot's treatment decisions is not enough to establish deliberate indifference. *Johnson v. Dominguez*, 5 F.4th 818, 826 (7th Cir. 2021).

Dr. Talbot's consistently responsive care does not support a claim of deliberate indifference. Because no reasonable jury could find that Dr. Talbot was deliberately indifferent to Mr. Ellis's asthma or other reported symptoms, summary judgment must be **granted** in his favor.

**B. First Amendment**

A plaintiff must establish three elements to prove a First Amendment retaliation claim. "First, he must show he engaged in protected First Amendment activity. Second, he must show an adverse action was taken against him. Third, he must show his protected conduct was at least a motivating factor of the adverse action." *Holleman v. Zatecky*, 951 F.3d 873, 878 (7th Cir. 2020).

In Mr. Ellis' amended complaint, he alleged that he filed a grievance about Dr. Talbot on February 5, 2019, because Dr. Talbot refused to order a breathing test and an EKG, and that Dr. Talbot began denying him medical treatment as a result. Dkt. 21 at 3. Mr. Ellis' amended complaint was not verified, and he did not introduce the grievance as an exhibit. Mr. Ellis did not respond to Dr. Talbot's facts or argument pertaining to Dr. Talbot's alleged retaliation. As discussed at length, Dr. Talbot provided Mr. Ellis a variety of medications and counseled him in response to his complaints. Moreover, no evidence indicates any connection between Mr. Ellis' grievances and Dr. Talbot's treatment.

Absent any evidence that Dr. Talbot's medical decisions were motivated by Mr. Ellis filing one grievance, summary judgment must be **granted** on the First Amendment claim as well.

## IV. Conclusion

The defendant's motion for summary judgment, dkt. [70], is **granted**, and all claims against Dr. Paul Talbot are **dismissed with prejudice**.

Final judgment consistent with this Order and the Order at docket [81] shall issue.

**SO ORDERED.**

Date: 9/30/2021

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

DEMAJIO J ELLIS
166596
NEW CASTLE - CF
NEW CASTLE CORRECTIONAL FACILITY - Inmate Mail/Parcels
1000 Van Nuys Road
NEW CASTLE, IN 47362

All Electronically Registered Counsel